JOHNSON COUNTY BROADCASTING CORPORATION, appellee, v. IOWA STATE HIGHWAY COMMISSION and STATE OF IOWA, appellants.

No. 51920.

(Reported in 140 N.W.2d 714)

898 

MARCH 8, 1966.

Raymond T. Walton, Special Assistant Attorney General, of Ames, and William L. Meardon, of Iowa City, both for appellants.

Swisher & Swisher and Messer & Cahill, all of Iowa City, for appellee.

SNELL, J.—██ This is an appeal in a condemnation case. It was before us previously on interlocutory appeal from the trial court's determination of law points. See Johnson County Broadcasting Corp. v. State Highway Comm., 256 Iowa 1251, 130 N.W.2d 707.

Our opinion on that appeal became the law of the case during further proceedings. Berger v. Amana Society, 253 Iowa 378, 382, 111 N.W.2d 753; Iowa-Illinois Gas and Electric Co. v. Gaffney, 256 Iowa 1029, 1033, 129 N.W.2d 832.

The case has now been tried to a jury and because of alleged

errors defendants have appealed. Except for the questions relating to values and damages the facts appear without substantial controversy.

In 1947 plaintiff-corporation was formed to own and operate a radio station. After considering four possible transmitter sites plaintiff acquired 26.21 acres just north of Iowa City. It was improved by installing radio towers, radial ground wires, broadcasting equipment and a 16x20 foot concrete block one-story building. Since 1948 it has been used as the transmitter site for station KXIC in Iowa City. It is connected by coaxial cable with its studio and business office in downtown Iowa City.

The station is licensed by the Federal Communications Commission to operate during daylight hours on a frequency of 800 kilocycles with power of 1000 watts. Two transmittal towers aided by underground radials and other equipment broadcast the radio signals and provide directional and power control to avoid unlicensed interference with other stations. Territory to the southwest is limited by prior rights of a Kansas City station, and to the northeast by prior rights of a Wisconsin station. The signal in those directions must be weaker than in other directions. The location of the towers is vital to a well-controlled antenna pattern. The situation is presently controlled.

Any requested license change faces serious obstacles.

There are no more frequencies available in the vicinity. Nighttime broadcast on 800 kilocycles is not permitted under a treaty between the United States and Mexico. That wavelength is owned by Mexico.

To avoid interference with other stations both power and signal direction must be controlled. The maximum power for which an 800-kilocycle broadcast can be licensed is 5000 watts. Geographical and geophysical problems are involved in the location of a transmitter site. On the site the transmitter towers must be located and spaced with exactness for directional power control.

The 26.21-acre site of plaintiff was adequate for the purposes for which station KXIC was or could be licensed under present regulations. For an increase of station power to 5000 watts a three-tower directional antenna with a different tower

arrangement from the present two would be necessary. For such a change the 26.21 acres were adequate.

On December 28, 1961, defendant highway commission condemned and took for the purpose of constructing a new highway eight and four-fifths acres of plaintiff's property. No part of plaintiff's installation was taken or disturbed and plaintiff was granted the right to maintain its radial ground system on the condemned area. The operation of the radio station after condemnation was the same as before and performance was approved by Federal Communications Commission.

There was evidence that a 5000-watt station would have a greater income potential than a 1000-watt station. There was evidence that after condemnation the remaining area was inadequate for the proper location of a three-tower directional antenna.

The officers of plaintiff-corporation had talked of the possibility of expanding facilities and increasing coverage through an increase in power. For such an increase approval by the Federal Communications Commission would be required. Some preliminary engineering studies had been made to determine what would be necessary to increase the power of the station to 5000 watts. Plaintiff never made application for nor received authority to operate a 5000-watt station.

Mr. Walter F. Kean, a consulting radio engineer specializing in broadcast consulting engineering, testified in detail and at length for plaintiff. He described the problems involved, the intricacies of solution and the procedure required. He testified as follows:

"For the continued operation at 1000 watts we made no studies, nor was any such study indicated, because the station is there and is operating and no change would be needed for a continued operation on the same basis. I did make, at the request of Mr. Full and the Johnson County Broadcasting, I did make a careful study culminating in a written report in November, 1961, I believe, of what would be necessary to increase the power of this station to 5,000 watts. * * *

"I thought this was an acceptable plan for raising the power of KXIC to 5000 watts. * * *

"The maximum power permitted by the Federal Communications Commission on 800 frequency is 5000 watts. It would not surprise me to learn that there are about 27 stations on that frequency now. We could possibly get interference from stations on 790 frequency. In the event of an increase in power, the station in Eau Claire, Wisconsin, could be involved, as well as KCMO in Kansas City, Missouri. There might be a hearing, though not necessarily so. If KXIC were to increase to 5000 watts, the first thing to be done after making a study or survey, would be to report to Johnson County Broadcasting Company the feasibility of such an application. My report would be strictly limited to things of an engineering nature rather than on an economic basis. Whether or not it would be economically feasible to go to 5000 watts is a decision for someone else to make. An increase in power requires different and more expensive equipment. You would have to consider the coverage on the market and many, many other things before determining whether to proceed with an application on the basis of an engineering study. Such study must show the existing and proposed service areas and populations. If the applicant determines that an increase is economically feasible, and the engineering study is proper, we would file the application and technical exhibits with the Federal Communications System as a request for a construction permit for the new facility. This is filed in Washington, D. C. It might take anywhere from ninety (90) days to seven (7) years for the application to be acted upon and it is common for a station such as KCMO or the Wisconsin station to file objections if KXIC seeks additional power if they thought there would be any interference. The Commission doesn't necessarily accept such objections, but they can be made. If another station asks for an increase in power, we might be asked to make a study to see if it would interfere with KXIC and if we find there is no basis for an objection, we advise our client not to object. If the other station's engineer has done his work well and properly, we will find no basis for objection. The F. C. C. is the body which determines whether or not the license or construction permit is to issue. Before the commission will review an application, it must offer the applicant an opportunity for a hearing

before an examiner. My opinion as to whether or not the F. C. C. would grant an application is similar to the opinion which a lawyer gives on a certain lawsuit and how it might come out. Some engineer or someone on the other side might have an opinion contrary to my own. I have done work for KXIC since 1959 and to my knowledge Johnson County Broadcasting Corporation has never filed an application for increase in power. In May of 1962, the Federal Communications Commission put in a 'freeze order' providing that no applications could be filed for a new facility. This order stayed in effect until July of 1964. The commission might put such a freeze order into effect again at any time. This is an indefinite and somewhat uncertain thing. Assuming that after a certain number of years an application was approved for KXIC to increase power, that does not mean that the station would be allowed to change to a night operation. Whether or not a station may operate 24 hours is not directly concerned with power. We could not operate 24 hours on 800 kilocycles because this is a Mexican clear channel and a treaty between Mexico and the United States prohibits the use of this channel after local sunset or before local sunrise. * * *

"I do not think we could move this transmitter site a couple of miles northwest. I hesitate to say how far we could move it. This is an engineering matter and without an exact calculation I cannot give a meaningful answer. I wouldn't want to say that we can or cannot move a half mile in any direction from this site because I have not determined it by calculation. I have made no study to determine how far we might be able to move to the northwest if property were available. The study and report which I made in November of 1961 was limited to the question of feasibility of 5000-watt operation on the property before and after condemnation, and it did not contemplate other problems that accrued to the one-kilowatt operation. In my opinion there has been no material deterioration of the operation of KXIC at one kilowatt. We made no survey to determine the availability of any other site."

Mr. John Stebbins, a media broker, called as a valuation witness by plaintiff, testified over objection that he assigned a substantial amount in his appraisal of this transmitter site to

the fact that the station could get 5000 watts. "My appraisal was based on the idea of going in and getting 5000 watts."

Mr. H. W. Cassill, a media broker, called as a valuation witness by plaintiff, testified over objection that "KXIC is worth 50% more as a 5000-watt station than it is as a one-kilowatt station." His estimate of value was computed at approximately six times its cash flow profit. His appraisal was on the basis of the station being able to obtain the 5000-watt license. Motions to strike the testimony of these valuation witnesses based on the assumption that the station could obtain a 5000-watt license were overruled. The trial court said there was definite evidence concerning the increase of wattage power, that it was outside the realm of speculation and that the Supreme Court erred in holding otherwise. We do not so read the record.

I. Wide variation in the opinions of valuation witnesses is not unusual. Here the variations are so great as to be almost fantastic and make it self-evident that the opinions were based on entirely different assumptions. The before condemnation value opinions varied from a high of $250,000 to a low of $57,000. The estimates of damage, i.e., the difference between before and after value varied from a high of $121,482.49 to a low of $10,000. The high values were on the assumption that the site would be used for a 5000-watt station. The low value ($57,000) was the opinion of a witness who was one of the original organizers of the station. He testified that a few years before condemnation he sold his 37 percent interest in the station for $43,000. The before and after value of all the property devoted to the operation of the radio station is not the measure of damage. We so said on the first appeal in this case. See 256 Iowa 1251, 1254, 130 N.W.2d 707, 709. However, one of plaintiff's valuation witnesses said that the antenna site was the major asset. "It is all-important. You could burn the studios tomorrow and it would not make any difference, but the antenna site is all-important."

The speculative and faulty assumptions of the witnesses as to matters involved in the measure of damage led to confusion of the jury. During deliberation the jury sent this inquiry to the presiding judge. "Is the jury to consider the economic feasibility of going to 5000 watts? This portion was only briefly

touched upon by witnesses." The court advised the jury that there was no need for further instructions.

██ II. It has been settled that plaintiff could show the value of the transmittal area for any use to which it may reasonably be adapted. 256 Iowa, loc. cit. 1253. It appeared from the evidence without contradiction that plaintiff's 26.21 acres were adequate and suitable for a 5000-watt three-tower directional antenna system. Whether plaintiff would ever be permitted to use the site for that purpose is an entirely different matter. Showing of adaptability of the site for a 5000-watt transmitter was not enough. The right to so use the site was not within plaintiff's control. There was no showing of reasonable certainty that it ever would be. On the first appeal of this case we said: "Whether plaintiff would have been able to obtain a permit to enlarge its operation to a 5000-watt station was speculative and uncertain." Loc. cit. 1257. We also said, "We have consistently held remote, contingent and speculative matters are not to be considered as evidence of value of condemned property." Loc. cit. 1256.

Admission of testimony as to value based on an assumed use of the site by plaintiff for a 5000-watt transmittal system was contrary to our holding.

██ III. There was no direct showing of the profits incident to the operation of station KXIC and no direct violation of the rule that value for condemnation purposes may not be shown by evidence of profits from a business operation. However, Mr. Cassill's opinion was based on six times the cash flow profit of the station. The opinion so based rested on a faulty premise. We have repeatedly said profit of a business is too uncertain and depends on too many contingencies to be safely accepted as any evidence of the usable value of property upon which the business is carried on. See opinion on first appeal, loc. cit. 1256, 1257 of 256 Iowa. Here we have opinion testimony based on uncertainty of profits from an uncertainty of obtaining a 5000-watt license.

If evidence of profits should be rejected it necessarily follows that opinion testimony based on inadmissible factors should be rejected. 5 Nichols, the Law of Eminent Domain, section

18.46, page 288; Wicks v. Iowa State Highway Commission, 254 Iowa 998, 1008, 119 N.W.2d 781.

IV. On the first appeal in this case we held that whether plaintiff would have been able to obtain a permit for a 5000-watt station was speculative and uncertain. See quote in Division II, supra.

In submitting the case to the jury the trial court included plaintiff's claim incident to "extinguishing plaintiff's rights to have a full-time 5000-watt station." There was no evidence that plaintiff had such a "right" and the statement submitted to the jury a matter we had said was speculative and uncertain. Instructions numbered 8 and 13 referring to the measure of damage did tell the jury to not consider anything remote, imaginary, uncertain or speculative. The instructions did, however, leave in the case plaintiff's claim of "right" to a 5000-watt station. The case was tried and submitted to the jury on a theory contrary to our pronouncement in the same case.

V. Instructions numbered 10 and 11 referred to increased inconvenience, if any, of access or unreasonable access to the highway right-of-way for maintaining plaintiff's radial ground wire system. There is nothing in the record before us to indicate any inconvenience whatsoever. Plaintiff's witnesses said everything was functioning the same as before condemnation. This was probably considered a matter of minor importance and we find no record of timely exceptions to these matters in the instructions.

VI. Defendants requested and the trial court refused the giving of an instruction as follows:

"You are instructed that the matter of whether or not Plaintiff would be able to increase the power of its radio station to five thousand (5000) watts is remote, uncertain and speculative and it should not be considered by you in arriving at your verdict."

This requested instruction was in accord with our previous holding. We find nothing in the present record to make our holding inapplicable. The instruction should have been given.

The case is reversed and remanded for a new trial.—Reversed and remanded.

All JUSTICES concur.